UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| BRENDA JOYCE NEWELL, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO. 1:15-cv-00029-SLC |
| COMMISSIONER OF SOCIAL SECURITY, sued as Carolyn W. Colvin, Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Brenda Joyce Newell appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion and Order.

### I. PROCEDURAL HISTORY

Newell applied for SSI in July 2012, alleging disability as of November 14, 2010.[2] (DE 11 Administrative Record ("AR") 173). The Commissioner denied Newell's application initially and upon reconsideration, and Newell requested an administrative hearing. (AR 112, 119). On August 8, 2013, a hearing was conducted by Administrative Law Judge William D. Pierson ("the

---

[1] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

[2] This is Newell's second application for SSI, as a prior application was denied on March 1, 2012 (AR 95), and she apparently did not appeal that decision. As such, *res judicata* applies in this decision through March 1, 2012.

ALJ"), at which Newell, who was represented by counsel at the time, and Charles McBee, a vocational expert (the "VE"), testified. (AR 33-91).

On November 19, 2013, the ALJ rendered an unfavorable decision to Newell, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform her past relevant work as an inspector as it is generally performed, as well as a significant number of other unskilled, light occupations in the economy. (AR 11-26). The Appeals Council denied Newell's request for review (AR 1, 7), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

Newell filed a complaint with this Court on January 26, 2015, seeking relief from the Commissioner's final decision. (DE 1). Newell argues in this appeal that the ALJ: (1) inadequately accounted for her right upper extremity limitations in the residual functional capacity ("RFC"); (2) erred at step two when finding that her mental impairments were non-severe; and (3) failed to account for her mental impairments when assigning the RFC. (DE 15 at 2-12).

## II. FACTUAL BACKGROUND[3]

### *A. Background*

At the time of the ALJ's decision, Newell was 48 years old (DE 167); had a high school education (DE 205); and had prior work experience as a custodian, warehouse filler, inspector, assembler, roller cleaner, and restaurant server (AR 73, 76-77, 205). Newell represented in her SSI application that she was seeking disability due to a torn right rotator cuff, depression, insomnia, memory loss, and hypertension. (AR 204).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 587-page administrative record necessary to the decision.

### B. *Newell's Testimony at the Hearing*

At the hearing, Newell testified that she lives by herself in an apartment, receiving food stamps and housing authority assistance. (AR 40). She stated that she had not driven in three years because she "can't comprehend from one step to the next." (AR 41). She said that she sometimes forgets to eat, take her medications, brush her teeth, and shower. (AR 56, 70). Her family brings her meals, assists her with household chores, and helps style her hair. (AR 56-57, 61).

Newell, who is right handed, testified that her right shoulder is painful and that she cannot raise it even halfway up. (AR 57). Her pain extends from the back of her neck through her shoulder, and she has spasms and numbness all day. (AR 58, 61). She complained that she frequently drops items from her right hand. (AR 57, 68). She stated that surgery was recommended, but that she could not afford it. (AR 57, 65-66). She takes two prescription medications for her pain, but states that the medications do not help and that nothing alleviates it. (AR 58, 60). She performs some, but not all, of the exercises from her physical therapy home program. (AR 68). She is awake for three hours at a time during the night and has no energy during the day. (AR 58-59).

As to her mental health, Newell stated that three or four days each week she stays in bed all day, does not get dressed, and has frequent crying spells. (AR 54, 61-62). She had recently seen a psychiatrist and been prescribed medication, but she stated the medication was not yet helping. (AR 55, 62-63). She complained of an inability to concentrate for more than two minutes at a time, difficulty interacting with people, irritability, frequent memory lapses, and nightmares. (AR 55-56, 66). She asserted that she needs simple instructions repeated numerous

3

times. (AR 66-67, 70). When asked why she waited until July 2013 to seek mental health treatment for her depression, Newell responded that she was too embarrassed to seek help from a psychiatrist. (AR 65).

### C. *Summary of the Relevant Medical Evidence*

In November 2010, Newell reported a work-related injury to her right shoulder after performing repetitive overhead lifting. (AR 482). She was seen by a nurse practitioner at Bridges to Health; significant spasm was noted in the right paracervical and trapezius. (AR 372-73). She was prescribed Flexeril and Prednisone and referred to physical therapy. (AR 372-73). Newell was released to return to work on December 20, 2010, with no restrictions, provided that she comply with her physical therapy schedule. (AR 331).

At her initial physical therapy appointment, Newell rated her right shoulder pain as a "10" on a 10-point scale. (AR 317-18). The therapist noted that Newell had pain and spasms in her upper trapezius and limited range of motion of her neck and shoulder. (AR 317-18). She was instructed in exercises and received pain-relief modalities; her pain decreased to a "seven" or "eight" after the session. (AR 315). Newell was contacted in December 2010 after she missed multiple therapy appointments to see if she wanted to continue; Newell stated that she did, but that she first needed to contact her doctor because her pain had increased. (AR 337-38, 340).

In January 2011, Newell returned to Bridges of Health for a follow-up of her right shoulder. (AR 371). She was still taking the prescribed medications, but stated that they were not very helpful. (AR 371). She again rated her pain as a "10" on a 10-point scale. (AR 371). She demonstrated limited extension and abduction of the right arm and reported pain from the

4

neck to the elbow upon range of motion, stating that the pain sometimes travels to her fingers and causes numbness. (AR 371). She was prescribed Neurontin. (AR 371). In February, Newell's Neurontin dosage was increased. (AR 370). In April, her shoulder discomfort was unchanged, and she was waiting for an appointment with an orthopedist. (AR 369). An MRI showed a small partial thickness tear at the insertion of the greater tuberosity of the supraspinatus tendon. (AR 330, 366, 369). In July 2011, Newell told her physical therapist that she had not been performing her home exercise program due to pain and because "healing" could compromise her worker's compensation case. (AR 365).

In February 2012, Newell was examined by Dr. Chandler Park. (AR 387). She told him that surgery had been recommended for her right shoulder, but that she could not afford it. (AR 387). Her strength in the right upper extremity was 4/5. (AR 391). Dr. Park wrote that Newell's right shoulder was difficult to assess because she refused to move it due to pain, and that he was not sure if there was pathology severe enough to cause such pain. (AR 392). He recommended an X-ray and MRI, pain medication, and physical therapy. (AR 392). Dr. Park noted that Newell had some intermittent trouble remembering things due to stress and depression, but that her depression and hypertension were well controlled. (AR 392). He declined to assess any work restrictions based on the visit. (AR 392).

Also in February 2012, Newell underwent a neuropsychological examination by Paul Roberts, Ph.D. (AR 379-86). Newell reported that she was independent in her self care, but that she uses her left arm for most activities. (AR 381). She appeared uncomfortable and frequently shifted positions, demonstrating grimacing and guarding behaviors on the right side. (AR 384). Newell's affect was moderately depressed and unstable with evidence of emotional lability, but

5

without mood swings; she denied any hallucinations or suicidal ideation. (AR 384). No formal thought disturbance was observed, and her insight, reasoning, and judgment were intact. (AR 384). She was able to follow simple instructions without repetition or clarification. (AR 384-85). Her attention and sustained concentration were adequate, she demonstrated good persistence and effort despite increasingly difficult items, and her memory functioning appeared intact. (AR 385).

Dr. Roberts opined that from a neurocognitive standpoint, Newell's overall performance suggested possible lower cognitive functioning, perhaps in the below average to borderline range, but that her cognitive status should not serve as a significant barrier to employment in an unskilled capacity. (AR 385). From a psychiatric standpoint, Newell's symptoms and history did not meet the diagnostic criteria for any major psychiatric disorder. (AR 385). Dr. Roberts assigned Newell a Global Assessment of Functioning ("GAF") score of 58 and the following diagnoses: a mood disorder due to a general medical condition with depressive and anxious features; a pain disorder associated with a general medical condition; and a sleep disorder due to pain, insomnia type.[4] (AR 385).

On February 28, 2012, Kenneth Neville, Ph.D., a state agency psychologist, reviewed

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id.* A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*
    "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Newell, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

Newell's record and completed a psychiatric review technique form. (AR 401-14). Dr. Neville found that Newell had mild restrictions in activities of daily living and mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (AR 411). Dr. Neville concluded that Newell's mental impairments were non-severe. (AR 413). That same day, Dr. J. Eskonen, a state agency physician, reviewed Newell's record and opined that her physical impairments were also non-severe. (AR 415).

In June 2012, Newell returned to Bridges of Health, reporting shoulder pain after attempting some yard work. (AR 441). She also stated that she felt depressed, but denied suicidal ideation. (AR 441). She was started on Lexapro for depression and restarted on Naproxen for her shoulder pain. (AR 441). A July 2012 treatment note reflected shoulder pain. (AR 440). Newell was still having some depression, but her affect was pleasant; her Lexapro dosage was adjusted. (AR 440).

In August 2012, Newell underwent a mental status examination by Henry Martin Ph.D., upon referral by the Social Security Administration (AR 448-52). Newell's mood and affect were depressed, and she became teary during the examination, expressing feelings of worthlessness. (AR 450). Dr. Martin assigned her a current GAF of 40 and diagnoses of major depression, dysthymic disorder, and dependent personality disorder. (AR 452). Dr. Martin noted on Axis IV of his diagnosis that Newell had psychosocial stressors of unemployment, lack of income, chronic pain, and depression. (AR 452).

On August 16, 2012, Kari Kennedy, Psy.D., a state agency psychologist, reviewed Newell's record and completed a psychiatric review technique form. (AR 454-67). She concluded that Newell had mild restrictions in activities of daily living and mild difficulties in

maintaining social functioning and in maintaining concentration, persistence, or pace. (AR 464). In her narrative, Dr. Kennedy wrote that Newell had stopped working due to her shoulder injury, not her mental status; that Newell had been prescribed medications by her primary care practitioner, not a specialist; that she had not participated in counseling; and that she had no psychiatric hospitalizations. (AR 466). Dr. Kennedy rejected the GAF score of 40 assigned by Dr. Martin, finding it inconsistent with Newell's daily activities and lack of mental health treatment. (AR 466). Dr. Kennedy noted that the record reflected Newell was able to follow instructions, get along with authority figures, and handle changes in routine. (AR 466). Dr. Kennedy concluded that Newell's mental impairment was non-severe. (AR 466). A second state agency psychologist later affirmed Dr. Kennedy's opinion. (AR 544).

In September 2012, Newell was examined by Dr. H.M. Bacchus at the request of Social Security; her reported conditions were a torn right rotator cuff, depression, insomnia, hypertension, and memory loss. (AR 482-83). She told Dr. Bacchus that her pain medication did not help her at all. (AR 482). Newell estimated that she could lift five pounds and sit, stand, and walk indefinitely. (AR 482). An examination revealed minor range of motion deficits, 3/5 muscle strength and tone in her right upper extremity, and 3/5 right grip strength; no spasms were noted. (AR 483). Dr. Bacchus's impression was a torn rotator cuff injury secondary to work; depression, post traumatic stress disorder, hypertension, and insomnia that were all treated and stable; and memory loss per history. (AR 483). Dr. Bacchus opined that Newell could work four to six hours per day with minor limitations to her right shoulder. (AR 483).

On September 27, 2012, Dr. L. Wunsch, a state agency physician, reviewed Newell's record and rejected the portion of Dr. Bacchus's opinion indicating that Newell could work just

8

four to six hours a day, finding it was more restrictive than the objective medical evidence supports. (AR 485). Dr. Wunsch noted that Newell had a small partial-thickness tear and minimal right acromioclavicular osteoarthritis. (AR 485). Dr. Wunsch considered that Newell's recent examination revealed 3/5 strength in the right upper extremity, 3/5 grip strength, and just a slight reduction in range of motion. (AR 485). Dr. Wunsch completed a physical RFC assessment form, indicating that Newell could lift 10 pounds frequently and 20 pounds occasionally; occasionally push or pull with the right upper extremity; perform unlimited reaching below shoulder height, frequent reaching to shoulder height, but no overhead work; sit for six hours in an eight-hour workday; stand or walk for six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to vibration and hazards. (AR 487-90). A second state agency physician, Dr. B. Whitley, later affirmed this opinion. (AR 545).

In June 2013, Newell complained of right shoulder pain to the nurse practitioner at Bridges to Health. (AR 586). On examination, her right shoulder was drooping lower than the left, and she had tenderness and reduced range of motion on the right. (AR 586). She was also depressed and irritable. (AR 586).

On July 5, 2013, Newell saw Dr. M. Shahid Kamal, a psychiatrist, upon referral from Bridges to Health. (AR 564-65). On examination, Newell was tearful at times, and her affect was dysphoric and anxious; she reported a depressed mood, but no psychotic thoughts, suicidal ideation, or hallucinations. (AR 564). Her fund of general knowledge was adequate, and her cognition, memory, judgment, and insight were fair. (AR 564). Dr. Kamal assessed a depressive disorder, not otherwise specified, and assigned her a GAF of 55. (AR 564-65). He wrote that

9

her prognosis was fair to good. (AR 565). Dr. Kamal saw Newell again on July 17, 2013. (AR 562).

On July 31, 2013, Newell told Dr. Kamal that things were going a little better for her. (AR 567). She was taking her medications and tolerating them well. (AR 567). Dr. Kamal observed that Newell appeared more relaxed than at her two prior visits. (AR 567). Newell asked Dr. Kamal to write a letter in support of her disability application. (AR 567). Dr. Kamal increased Newell's Wellbutrin. (AR 567). On August 7, 2013, Dr. Kamal penned a brief letter, enclosing his initial evaluation and three treatment notes. (AR 566). Dr. Kamal wrote that Newell had become his patient on July 5, 2013, and that her most recent appointment was July 31, 2013; that he had diagnosed her with a depressive disorder; and that he had prescribed her Wellbutrin, Celexa, Elavil, and Clonidine. (AR 566).

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

10

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV.  ANALYSIS

### *A.  The Law*

Under the Act, a plaintiff is entitled to SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Newell is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

11

Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. *The ALJ's Decision*

On November 19, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 11-26). He found at step one of the five-step analysis that although Newell had worked after her alleged onset date, the income from the work activity was below substantial gainful activity levels, and thus, did not constitute disqualifying substantial gainful activity. (AR 14). At step two, he determined that Newell had the following impairments, which were severe when considered in combination: a very small partial thickness tear of the right distal supraspinatus, mild right bursal fraying, and minimal right acromioclavicular osteoarthritis. (AR 14). At step three, the ALJ determined that Newell's impairment or combination of impairments were not severe enough to meet a listing. (AR 17).

Before proceeding to step four, the ALJ determined that Newell's symptom testimony was "not entirely credible" and assigned an RFC for "light work . . . except never climbing ladders, ropes, or scaffolds, and no overhead reaching or overhead work activity with the dominant right upper extremity." (AR 17). Based on this RFC and the VE's testimony, the ALJ concluded at step four that Newell was able to perform her past relevant work as an inspector as it is generally performed. (AR 21).

Alternatively, the ALJ found at step five that a hypothetical individual with Newell's

12

RFC, experience, and education—even if that individual were additionally limited to simple, routine, and repetitive tasks—could also perform other unskilled, light occupations in the economy, including photocopy machine operator, inspector and hand packager, and palletizer. (AR 22). Therefore, Newell's claim for SSI was denied. (AR 25-26).

### C. The RFC Assigned by the ALJ Fails to Adequately Account for Newell's Right Upper Extremity Limitations

Newell argues that the ALJ failed to adequately account for her right upper extremity limitations in the RFC and in the hypotheticals posed to the VE at step five. Newell's argument ultimately is persuasive.

The RFC is a determination of the tasks a claimant can do despite her limitations. 20 C.F.R. § 416.945(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 416.945. Therefore, when determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe. 20 C.F.R. § 416.945(a)(2); *see Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

Here, the ALJ assigned Newell an RFC for a limited range of light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds." 20 C.F.R. § 416.967(b). A job is considered light work "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and

13

pulling of arm and leg controls." 20 C.F.R. § 416.967(b). The ALJ then reduced this light work category further by assigning Newell additional limitations: no climbing on ladders, ropes, or scaffolds; and no overhead reaching or overhead work activity with the dominant right upper extremity. (AR 17).

In assigning this RFC, the ALJ explained: "The undersigned gives significant weight to the State agency's exertional limitations and manipulative limitations. However, the undersigned did not include postural or environmental limitations from the State agency's opinion, as they are not sufficiently supported by the overall medical evidence." (AR 21). The ALJ further stated: "In sum, the [RFC] assessment is supported by the opinions of State agency physicians, State agency psychologists, and right upper extremity limitations by Dr. Bacchus." (AR 21).

Although the ALJ stated that he afforded "significant weight" to the State agency physicians' exertional and manipulative limitations, and that the assigned RFC is supported by the opinions of the State agency physicians, in actuality, the RFC and the hypotheticals posed to the VE at step five do *not* include all of the exertional and manipulative limitations assigned by the State agency physicians. More specifically, on September 27, 2012, Dr. Wunsch, a state agency physician, opined that Newell could perform only occasional pushing and pulling with the right upper extremity. (AR 487). The physical RFC assessment that Dr. Wunsch completed defines "occasionally" as "occurring from very little up to one-third of an 8-hour workday[,]" and "frequently" as "occurring one-third to two-thirds of an 8-hour workday[.]" (AR 486). On December 5, 2012, Dr. Whitley, another state agency physician, reviewed Newell's record and affirmed Dr. Wunsch's assessment as written. (AR 545).

14

The ALJ, however, did not incorporate *any* limitation with respect to pushing and pulling with the right upper extremity into Newell's RFC. (AR 17). And when posing progressive hypotheticals to the VE at step five, the ALJ recited that the hypothetical individual could perform "pushing and pulling ten pounds *frequently*, 20 pounds occasionally." (AR 74 (emphasis added)).

Nor did the ALJ explain why he failed to include in the RFC the limitation concerning occasional pushing and pulling with the right upper extremity. "If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Furthermore, in this instance, the ALJ expressly assigned "significant weight" to the exertional and manipulative limitations opined by Dr. Wunsch. (AR 21). This reasonably suggests that the ALJ inadvertently overlooked Dr. Wunsch's exertional limitation on pushing and pulling with the right upper extremity.

"While the ALJ need not comment on every piece of evidence in the record, [he] cannot ignore important evidence that directly contradicts one of [his] findings." *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1047-48 (E.D. Wis. 2005) (collecting cases); *compare Burke v. Colvin*, No. 11 C 50001, 2013 WL 5288155, at *14 (N.D. Ill. Sept. 17, 2013) (remanding the ALJ's decision where the ALJ failed to explain why she did not adopt a medical source opinion that conflicted with the RFC), *with Niemiec v. Colvin*, No. 2:12-cv-286, 2013 WL 4782322, at *14 (N.D. Ind. Sept. 5, 2013) (affirming the ALJ's decision where the ALJ explained the basis for adopting an RFC inconsistent with a medical source opinion).

On this record, the Court is simply without sufficient basis to conclude whether Newell,

15

if she were additionally limited to occasional pushing and pulling with the right upper extremity, could perform either her past work as an inspector as it is generally performed, or the other three representative jobs identified by the ALJ at step five.[6] (*See* AR 71-83). Consequently, the ALJ's decision will be remanded for further consideration of the RFC and the hypotheticals posed to the VE at step five concerning Newell's right upper extremity limitations.[7] *See Clifford*, 227 F.3d at 872 (emphasizing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion" (citations omitted)).

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Newell and against the Commissioner.

SO ORDERED.

Enter for this 16th day of February 2016.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[6] The ALJ also failed to include in the RFC Dr. Wunsch's opinion that Newell was limited to frequent reaching to shoulder height. (AR 489). Nevertheless, the ALJ asked the VE in the progressive hypotheticals at step five whether the hypothetical individual could still perform the jobs of photocopy machine operator, inspector and hand packager, and palletizer if she were unable to elevate her dominant arm above chest level. (AR 80). The VE responded that such an individual could still perform those jobs. (AR 80). Therefore, any failure by the ALJ to include the limitation of frequent reaching to shoulder height in the RFC would constitute "harmless error." *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).

[7] Because the ALJ's decision will be remanded for further consideration of the RFC with respect to Newell's right upper extremity limitations, the Court need not reach her remaining arguments concerning the ALJ's assessment of her mental limitations at step two as non-severe and the ALJ's failure to incorporate any mental limitations into the RFC.